# In the United States Court of Federal Claims

No. 19-469C
(E-Filed:  June 24, 2019)[1]

| | |
|---|---|
| iACCESS TECHNOLOGIES, INC., | ) |
| Plaintiff, | ) |
| v. | ) Pre-Award Bid Protest; |
| THE UNITED STATES, | ) Exclusion from Competitive Range; Unsuccessful Challenge to Technical Ratings; |
| Defendant, | ) Discussions Held with Offerors Were Meaningful and Not |
| and | ) Misleading; No Improper Responsibility Determination. |
| L-3 COMMUNICATIONS INTEGRATED SYSTEMS L.P., | ) |
| Intervenor-defendant. | ) |

Richard J.R. Raleigh, Jr., Huntsville, AL, for plaintiff.  Jerome S. Gabig and Christopher L. Lockwood, of counsel.

Margaret J. Jantzen, Trial Attorney, with whom were Joseph H. Hunt, Assistant Attorney General, Robert E. Kirschman, Jr., Director, Lisa L. Donahue, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant.

---

[1]     This opinion was issued under seal on May 31, 2019.  Pursuant to ¶ 5 of the ordering language, the parties were invited to identify source selection, proprietary or confidential material subject to deletion on the basis that the material was protected/privileged.  The redactions jointly proposed by plaintiff and the government were acceptable to the court—with some minor modifications intended to preserve the structure, but not all of the content—of the sentences that were redacted.  All redactions are indicated by brackets ([ ]).

Craig A. Holman, Washington, DC, for intervenor-defendant.  Mark D. Colley, Dana E. Koffman, Emma K. Dinan, and Nathaniel E. Castellano, of counsel.

OPINION AND ORDER

CAMPBELL-SMITH, Judge.

This pre-award bid protest is before the court on the parties' briefing of dispositive motions brought under Rules 12(b) and 52.1(c) of the Rules of the United States Court of Federal Claims (RCFC).[2]  These briefs were filed pursuant to an expedited schedule largely determined by the government's voluntary stay of contract award through May 31, 2019.  The briefs before the court, in chronological order, are as follows:  plaintiff's memorandum in support of its motion for judgment on the administrative record (AR), ECF No. 55-1; intervenor-defendant's memorandum in support of its motion to dismiss and cross-motion for judgment on the AR, ECF No. 58-1; defendant's cross-motion for judgment on the AR, ECF No. 59; plaintiff's response/reply brief, ECF No. 62; intervenor-defendant's reply brief, ECF No. 65; and, defendant's reply brief, ECF No. 66.

In addition, the court has reviewed the amended complaint.  See ECF No. 45.  The AR has also been considered by the court.  See ECF Nos. 21-25, 52.  Oral argument was deemed to be unnecessary.  For the reasons set forth below, plaintiff's motion for judgment on the AR is **DENIED**; intervenor-defendant's motion to dismiss or, in the alternative, cross-motion for judgment on the AR is **DENIED in part**, as to the motion to dismiss, and **GRANTED in part**, as to the cross-motion for judgment on the AR; and, defendant's cross-motion for judgment on the AR is **GRANTED**.

I.    Background

A.    Overview

The procurement that underlies this protest is for avionics modernization of 176 C-130H aircraft.  ECF No. 23-2 at 58.  The United States Air Force issued Solicitation No. FA8625-17-R-6608 (solicitation or RFP) on September 1, 2017.  ECF No. 21-3 at 915-19.  Six offerors responded to the solicitation, including iAccess Technologies, Inc. (iAccess), plaintiff, and L-3 Communications Integrated Systems L.P. (L3), intervenor-defendant in this matter.  ECF No. 25-2 at 2.  One of the offerors, a small business, was eliminated from the competitive range of proposals on or about August 9, 2018.  Id. at 19-20, 27; see also ECF No. 25-1 at 858 (noting that iAccess and the offeror eliminated in the first competitive range determination were small businesses).

---

[2]    Although intervenor-defendant does not cite RCFC 12(b), its arguments for dismissal of plaintiff's bid protest are typically considered under this rule.

The remaining five offerors entered into discussions with the Air Force to address the agency's concerns about their proposals.  ECF No. 25-2 at 901.  These Round 1 discussions included the following components:  (1) the Air Force provided each offeror with numbered Evaluation Notices (ENs) asking the offeror to address the agency's concerns; (2) each offeror was permitted to ask questions about the ENs, to which the agency provided responses; (3) a conference call was held with each offeror; and (4) the offeror submitted its written responses to each of the ENs.  Id.

The agency also conducted Round 2 discussions with offerors to address concerns that had not been resolved in Round 1.  Id.  The procedure was similar, where the Air Force provided numbered ENs to the offerors, conference call questions and written questions provided the offerors with an opportunity to obtain feedback about the Round 2 ENs, and, finally, the offerors provided the agency with their written responses to the Round 2 ENs.  Id.

Once Round 2 discussions had been completed, iAccess was eliminated from the competitive range on December 14, 2018, and was notified of the agency's decision on December 18, 2018.  ECF No. 25-3 at 11-15.  One of the three principal bid protest grounds before the court is iAccess's contention that the discussions held by the agency were not meaningful and were misleading.  ECF No. 55-1 at 30-31.  The other two principal bid protest grounds here are that the technical ratings justifying the agency's second competitive range decision (SCRD) were flawed, and that the agency improperly rejected iAccess's proposal for responsibility reasons, rather than for technical acceptability reasons.  Id. at 20-43.

Once iAccess, the only small business remaining in the first competitive range, had been eliminated by the SCRD, the four remaining offerors were permitted to submit final proposal revisions.  ECF No. 25-3 at 348.  L3 was selected for award.  Id. at 350, 473-82.  However, before the Air Force could execute a contract with L3, this pre-award bid protest was filed on March 29, 2019.  The agency agreed to voluntarily stay contract award through May 31, 2019.  ECF No. 46 at 2 (joint notice).

B.      Proposal Evaluation Scheme

"This is a best value source selection conducted in accordance with . . . Federal Acquisition Regulation (FAR) 15.3."[3]  ECF No. 23-2 at 87.  The solicitation contemplated an integrated assessment of Technical Rating, Technical Risk Assessment, and Price.  Id.  Two evaluation factors, Technical Risk and Price, had approximately

---

[3]      All citations to the FAR in this opinion are to the 2018 version of Title 48 of the Code of Federal Regulations.

equal weight.  Id.  However, only Technically Acceptable proposals would be considered for the tradeoff analysis.  Id.

There were two technical subfactors:  Schedule and Systems Engineering.  Id. at 89.  Each of these subfactors would be separately rated for both acceptability and risk. Id.  "A Technical Rating of Unacceptable or a Technical Risk Rating of High or Unacceptable will render a proposal ineligible for award."  Id.  Each of the technical subfactors was further divided into Measures of Merit (MoMs).  Id. at 90.

The primary focus here is on the MoMs applicable to the second technical subfactor, Systems Engineering.  These are MoMs M4 through M12.  Id. at 92-94.  M12, however, did not contribute to the Technical Risk rating for Systems Engineering, because this MoM measured the offeror's agreement to comply with small business contracting requirements.  Id. at 89, 92, 94.

An Unacceptable technical rating reflects the agency's judgment that the proposal "does not meet the requirements of the solicitation."  Id. at 90.  A High Technical Risk rating indicates, first, that the proposal "contains a significant weakness or combination of weaknesses which is likely to cause significant disruption of schedule, increased cost or degradation of performance," and, second, that the proposed approach is "unlikely to overcome any difficulties, even with special contractor emphasis and close Government monitoring."  Id. at 91.

The government would also "consider, throughout the evaluation, the 'correction potential' of any deficiency" in a proposal.  Id. at 87.  In this regard, the solicitation states that "[i]f an aspect of an Offeror's proposal not meeting the Government's requirements is not considered correctable, or if the amount and/or complexity of the corrections needed to meet the Government requirement requires a major proposal revision, the Offeror may be eliminated from the competitive range."  Id.  The court reserves further discussion of the solicitation for the analysis section of this opinion.

II.     Standards of Review

A.     Dismissal under RCFC 12(b)(1)

When reviewing a complaint to determine its jurisdiction over a plaintiff's claims, this court must presume all undisputed factual allegations to be true and construe all reasonable inferences in favor of the plaintiff.  Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), abrogated on other grounds by Harlow v. Fitzgerald, 457 U.S. 800 (1982); Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 747 (Fed. Cir. 1988) (citations omitted).  Plaintiff bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence.  Reynolds, 846 F.2d at 748 (citations omitted).  If jurisdiction is found to be lacking, this court must dismiss the action.  RCFC 12(h)(3).

B.     Dismissal under RCFC 12(b)(6)

It is well-settled that a complaint should be dismissed under RCFC 12(b)(6) "when the facts asserted by the claimant do not entitle him to a legal remedy." Lindsay v. United States, 295 F.3d 1252, 1257 (Fed. Cir. 2002).  When considering a motion to dismiss brought under RCFC 12(b)(6), "the allegations of the complaint should be construed favorably to the pleader." Scheuer, 416 U.S. at 236.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

C.     Bid Protest Standard of Review

1.     Judgment on the Administrative Record

RCFC 52.1(c) provides for judgment on the administrative record.  To review a motion, or cross-motions, under RCFC 52.1(c), the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record. Bannum, Inc. v. United States, 404 F.3d 1346, 1356-57 (Fed. Cir. 2005). The court must make factual findings where necessary. Id.  The resolution of RCFC 52.1(c) cross motions is akin to an expedited trial on the paper record. Id.

2.     Arbitrary and Capricious Standard

As the United States Court of Appeals for the Federal Circuit has stated, "the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A) [(2012)]:  a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Banknote Corp. of Am. v. United States, 365 F.3d 1345, 1350-51 (Fed. Cir. 2004) (citing Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1057-58 (Fed. Cir. 2000)).  Under this standard, a procurement decision may be set aside if it lacked a rational basis or if the agency's decision-making involved a clear and prejudicial violation of statute, regulation or procedure. Emery Worldwide Airlines, Inc. v. United States, 264 F.3d 1071, 1085-86 (Fed. Cir. 2001) (citing Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332-33 (Fed. Cir. 2001)).  "The arbitrary and capricious standard applicable [in bid protests] is highly deferential." Advanced Data Concepts, 216 F.3d at 1058.

The level of deference depends on the circumstances of the procurement and the errors alleged by the protestor.  In negotiated procurements, "the protestor's burden of proving that the award was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law is greater than in other types of bid protests." Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1330 (Fed. Cir. 2004) (citation omitted). When technical evaluation errors are alleged, those technical ratings fall within a

category of "discretionary determinations of procurement officials that a court will not second guess." E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996). Finally, in best value procurements "the contracting officer ha[s] even greater discretion than if the contract were to have been awarded on the basis of cost alone." Galen, 369 F.3d at 1330 (citing E.W. Bliss, 77 F.3d at 449).

De minimis errors in the procurement process do not justify relief. Grumman Data Sys. Corp. v. Dalton, 88 F.3d 990, 1000 (Fed. Cir. 1996) (citing Andersen Consulting v. United States, 959 F.2d 929, 932-33, 935 (Fed. Cir. 1992)). The bid protest plaintiff bears the burden of proving that a significant error marred the procurement in question. Id. (citing CACI Field Servs., Inc. v. United States, 854 F.2d 464, 466 (Fed. Cir. 1988)). Examples of arbitrary and capricious agency action include "when the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" Ala. Aircraft Indus., Inc.-Birmingham v. United States, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)) (alteration in original). The court will, however, "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974) (citation omitted).

"'If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations.'" Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971)).

3.    Prejudice

To establish a plaintiff's standing to bring a bid protest, the protestor generally must show that it had a substantial chance of contract award. See Orion Tech., Inc. v. United States, 704 F.3d 1344, 1349 (Fed. Cir. 2013) (holding that where "an adequate factual predicate" exists, even in a pre-award scenario, prejudice is established if the protestor can show that it had a substantial chance of award but for the procurement errors alleged). This initial inquiry into prejudice has been described as the establishment of "potential prejudice[] [i]f the various challenges to the [procurement process] were well-founded." Beta Analytics Int'l, Inc. v. United States, 67 Fed. Cl. 384, 396 (2005). If, on the merits, the court finds that procurement errors have indeed occurred, a second prejudice inquiry is required. See, e.g., Glob. Comput. Enters., Inc. v. United States, 88 Fed. Cl. 350, 401 ("Confusion over the standard of prejudice necessary for establishing standing exists 'because, in addition to being an element of standing, a showing of prejudice is required before injunctive relief is granted.'") (citations omitted), modified on reconsideration, 88 Fed. Cl. 466 (2009). The second prejudice inquiry asks, again,

whether "there was a 'substantial chance' [the protestor] would have received the contract award but for the errors" made by the agency.  Bannum, 404 F.3d at 1353 (citations omitted).

As this court has explained:

> Th[e] first showing of prejudice to the protestor, in order to prove standing, must occur before reaching the merits of the bid protest review. See Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (stating that "because the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits").  The Federal Circuit has also stated that the two-step review of contract awards begins with an "arbitrary and capricious" review of an award and then proceeds to the issue of prejudice to the protestor. Bannum, Inc. v. United States, 404 F.3d 1346, 1351 (Fed. Cir. 2005).  This court thus looks twice at prejudice, first weighing prejudice as it pertains to standing, and then more thoroughly weighing prejudice to determine whether plaintiff shall be afforded relief.  See Night Vision Corp. v. United States, 68 Fed. Cl. 368, 392 & n.23 (2005) (characterizing the prejudice determination for standing purposes as a "limited review for prejudice," seeking "minimum requisite evidence necessary for plaintiff to demonstrate prejudice and therefore standing").

A & D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 n.4 (2006).

For the second inquiry into prejudice, plaintiff again bears the burden of proof and must "show that there was a 'substantial chance' [plaintiff] would have received the contract award but for the [government's] errors in the [procurement] process."  Bannum, 404 F.3d at 1358 (citations omitted).  In other words, if a protestor can show that there was a substantial chance that it would have won the contract award but for the procurement errors of the agency, relief may be granted because prejudicial error has been established.  Id. at 1353 (citations omitted).  "Prejudice is a question of fact."  Id. at 1353 (citing Advanced Data Concepts, 216 F.3d at 1057).

4.      Permanent Injunctive Relief

As the Federal Circuit has held:

> In deciding whether a permanent injunction should issue, a court considers: (1) whether, as it must, the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief.

PGBA, LLC v. United States, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004) (citing Amoco Prod. Co. v. Vill. of Gambell, Alaska, 480 U.S. 531, 546 n.12 (1987)).


III.    Analysis

iAccess's arguments for judgment on the administrative record can be divided into three principal inquiries.[4] ECF No. 55-1 at 7-9. First, did the agency err when it assigned iAccess an Unacceptable rating and a High Technical Risk rating for the Systems Engineering technical subfactor, and also concluded that iAccess's proposal flaws lacked correction potential? Second, were the discussions held with iAccess meaningful and not misleading? Third, was the agency obliged to consult with the Small Business Administration before eliminating iAccess from the competitive range? Before addressing these questions, however, the court considers whether L3's motion to dismiss has merit.

A.    L3's Arguments for Dismissal

1.    Standing

According to L3, "iAccess has not and cannot establish that it has a substantial chance for award." ECF No. 58-1 at 18. The court disagrees. If all of the alleged procurement errors asserted by iAccess have merit, but for those errors iAccess would have remained in the competitive range and would have been afforded an opportunity to submit a final proposal revision with a revised price. ECF No. 62 at 26-27. Under the circumstances of this procurement, iAccess has established standing under the substantial chance test.

L3 also appears to argue that iAccess must prevail on the merits of its protest to establish standing. In this regard, L3 asserts that "unless iAccess can demonstrate that it has both an Acceptable Technical rating and at least a Marginal Risk rating under [Systems Engineering], iAccess is ineligible for award." ECF No. 58-1 at 20 (citing COMINT Sys. Corp. v. United States, 700 F.3d 1377, 1383-84 (Fed. Cir. 2012)). L3's standing argument contravenes established precedent and, in the court's view, misreads COMINT.

---

[4]    The court has considered all of plaintiff's challenges to its elimination from the second competitive range, and all of the government's and L3's counter-arguments. Although only the most prominent arguments advanced by the parties are discussed in this opinion, the court's resolution of this bid protest is founded on a comprehensive review of the record and all of the parties' arguments. Any of plaintiff's arguments not discussed here were deemed unpersuasive.

As discussed <u>supra</u>, there are two distinct types of prejudice inquiries in bid protests before this court, and the decision in <u>COMINT</u> acknowledges this fact. <u>See</u> 700 F.3d at 1383 ("Here, the propriety of the marginal Quality/Capability rating assigned to Comint by the agency is determinative of <u>both</u> Comint's standing and the merits" of its protest.") (emphasis added). Generally, "substantial chance" prejudice is determined at the outset, to establish standing. <u>See, e.g.</u>, <u>Info. Tech. & Applications Corp. v. United States</u>, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (<u>ITAC</u>) (stating that "because the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits"). Standing is an element of this court's jurisdiction over bid protest cases. <u>See</u> <u>Rex Serv. Corp. v. United States</u>, 448 F.3d 1305, 1307-08 (Fed. Cir. 2006) (upholding a dismissal for lack of jurisdiction because the protestor was not an actual bidder in the competition and could not show prejudice, <u>i.e.</u>, that it had a substantial chance of receiving the contract but for the alleged procurement errors). Here, the threshold inquiry into standing does not require that iAccess first prevail on the merits of its protest. <u>See, e.g.</u>, <u>ITAC</u>, 316 F.3d at 1319 ("ITAC has established prejudice (and therefore standing), because it had greater than an insubstantial chance of securing the contract <u>if successful on the merits of the bid protest</u>.") (emphasis added).

To read <u>COMINT</u> as requiring success on the merits of the protest to establish standing would conflict with the standing analysis in <u>ITAC</u>, which is itself cited by the <u>COMINT</u> panel. 700 F.3d at 1384 (citing <u>ITAC</u>, 316 F.3d at 1319). In its opening brief, ECF No. 58-1 at 20, L3 relies on the following passage in <u>COMINT</u> for the draconian test for standing intervenor-defendant proposes here:

> Because Comint has not shown that its marginal Quality/Capability rating was arbitrary or capricious, Comint cannot show that it had a substantial chance of receiving the award. Comint thus cannot demonstrate standing to object to the agency's failure to award it a contract. <u>See</u> <u>Info. Tech. & Applications Corp. v. United States</u>, 316 F.3d 1312, 1319 (Fed. Cir. 2003).

700 F.3d at 1384. This is not a radical revision of the binding precedent regarding standing set forth in <u>ITAC</u>.

The conclusion regarding standing in the <u>COMINT</u> decision merely indicates that the second inquiry as to actual prejudice, under the circumstances of that protest, was also determinative of the threshold inquiry into prejudice for the purposes of determining standing. <u>Id.</u> In other words, the "potential prejudice" necessary for standing purposes had been extinguished by the lack of actual prejudice. <u>Beta Analytics</u>, 67 Fed. Cl. at 396; <u>see also</u> <u>Orion</u>, 704 F.3d at 1349 n.1 (distinguishing <u>COMINT</u> on the basis that "no such determination on the merits" had been made in <u>Orion</u>). Once the proper test for standing is applied, iAccess has standing to bring this bid protest.

    2.    Waiver

L3 also argues that iAccess waived its protest under the authority of the waiver doctrine announced in Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308 (Fed. Cir. 2007). ECF No. 58-1 at 21. In Blue & Gold Fleet, the court stated:

> We also hold that a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims.

492 F.3d at 1313. According to L3, the waiver doctrine has been further extended to other procurement events that are evident before award, not just the occurrence of patent errors in a solicitation, so that these events also trigger a duty to protest before the contract is awarded. ECF No. 58-1 at 21-23. In short, L3 argues that once iAccess was notified that it was eliminated from the competitive range on December 18, 2018, it could not wait until March 29, 2019, to file its pre-award bid protest without waiving its right to protest its elimination from the competitive range. Id.

At the heart of this dispute is the Federal Circuit's COMINT decision, which extended the Blue & Gold Fleet waiver rule to bar a challenge to a solicitation amendment that took effect after bidding had closed, and that was alleged to have been improper in a post-award bid protest. See 700 F.3d at 1382 ("[W]e think the reasoning of Blue & Gold applies to all situations in which the protesting party had the opportunity to challenge a solicitation before the award and failed to do so."). A reasonable reading of COMINT limits its extension of the waiver rule to patent errors in a solicitation occurring after bidding has closed but before the contract has been awarded. Id. ("[A]ssuming that there is adequate time in which to do so, a disappointed bidder must bring a challenge to a solicitation containing a patent error or ambiguity prior to the award of the contract."). Indeed, this court recently issued a decision that interpreted COMINT in that manner. See ATSC Aviation, LLC v. United States, 141 Fed. Cl. 670, 694 (2019) ("The Federal Circuit extended this waiver rule to post-award challenges of a solicitation when the error arose in the interval between the close of bidding and the award of the contract." (citing COMINT, 700 F.3d at 1382)).

ATSC is analogous to this case, because that decision, too, addressed a claim that the protestor had been improperly removed from a competitive range of offerors. Id. at 673, 692, 694. There could also be significant factual distinctions between ATSC and this case, including, perhaps, the extent of the protestor's knowledge of the reasons the agency eliminated its proposal from the competitive range. See id. at 694 (noting that the protestor in ATSC alleged that the "evaluative error was not evident before the final award"). The court does not disagree, however, with ATSC as to its application of COMINT to the circumstances of that case; nor does the court disagree with the determination in ATSC that the protestor's claims were not waived under those circumstances. See id. at 696 ("The waiver doctrine explicated in COMINT and Blue & Gold does not bar ATSC's protest given the somewhat unusual setting of this case.").

L3 argues that a broader reading of COMINT should be applied in this case, relying primarily on Synergy Solutions, Inc. v. United States, 133 Fed. Cl. 716 (2017). ECF No. 58-1 at 21; ECF No. 65 at 11-12. The court focuses on key aspects of Synergy without reproducing here the entirety of the lengthy discussion of waiver and COMINT contained in Synergy. Of note, the Synergy decision explains that the Blue & Gold Fleet waiver rule is analogous to timeliness restrictions on bid protests brought before the Government Accountability Office (GAO). Synergy, 133 Fed. Cl. at 738 (citing Blue & Gold Fleet, 492 F.3d at 1313-15). The Federal Circuit in COMINT also drew parallels between the timeliness rules governing GAO protests and that court's application of waiver to one of the protest grounds in the appeal before it. 700 F.3d at 1383 (citing 4 C.F.R. § 21.2). Certainly the fact that iAccess's protest might have been untimely at the GAO, because this protest was filed more than ten days after iAccess knew that it had been eliminated from the competitive range, weighs, to some degree, in favor of the application of waiver here.[5] See 4 C.F.R. § 21.2(a)(2) (2018) (stating that protests are untimely if filed more than ten days after the alleged procurement improprieties were "known or should have been known," although debriefing rights may affect this deadline).

According to Synergy, the waiver rule in COMINT is not limited to challenges to solicitation terms, but may be applied more broadly to challenges to the agency's actions taken after the close of bidding but before contract award:

> Thus, the court respectfully declines to follow the reasoning in [Vanguard Recovery Assistance v. United States, 99 Fed. Cl. 81 (2011)]. As noted above, in that case—which is not binding authority—the court drew a distinction between perceived defects in the solicitation versus perceived defects in the evaluation process. The undersigned does not view the reasoning of the Federal Circuit in Comint Systems as being so limited. Rather, the language in Comint Systems expresses a clear, practical intent to expand the reach of the Blue & Gold Fleet waiver rule to include any defects that could potentially be raised and resolved prior to the contract award, despite the fact that in Comint Systems, the defect at issue related to an amended solicitation and not a defect arising during the evaluation process.

---

[5]    According to L3, iAccess did not receive the debriefing that the agency prepared because "iAccess apparently failed to timely request and thus never received the debriefing that the Agency had prepared." ECF No. 58-1 at 15. The record is not clear on this point. See ECF No. 25-3 at 419-20 (showing that iAccess requested a debriefing that was scheduled by the agency for February 20, 2019); see also ECF No. 25-2 at 855-97 (prepared debriefing slides). Whether or not iAccess took advantage of its right to a debriefing would have been a factor in the timeliness of any protest brought by iAccess at the GAO. See 4 C.F.R. § 21.2(a)(2) (2018).

See also Jacobs Tech., Inc. v. United States, 100 Fed. Cl. 179, 182 n.4 (2011) ("Although [Blue & Gold Fleet] deals with a protester's objections to terms of the solicitation, this Court suggests that it raises legitimate concerns for prudent protesters challenging the solicitation process or the evaluation of offerors' proposals.").

Synergy, 133 Fed. Cl. at 740.  The court notes that the procurement challenge discussed in Synergy had already been rejected by the GAO, on waiver grounds, and that the protest before the court focused on an alleged failure of the agency to hold discussions, not the exclusion of an offeror from the competitive range of proposals.  Id. at 739.  The underlying facts in Synergy also included two GAO protests and corrective action undertaken by the agency, circumstances that are not present in iAccess's protest before this court.  Id. at 729-33.

The court considers both decisions of this court, ATSC and Synergy, to be reasonable interpretations of the holding in COMINT, as applied to the facts of each of those protests.  The facts of iAccess's protest align more closely with those in ATSC.  The court observes, too, that the general rule stated in Synergy does not compel a finding that iAccess's protest was necessarily waived here:  "the prejudiced offeror was obliged to raise its objection to the amended solicitation as early as possible and at a minimum, prior to the agency's award of the contract."  133 Fed. Cl. at 740 (citing COMINT, 700 F.3d at 1383).  Here, iAccess brought its protest before the award to L3 occurred.  Under the facts of this case, the court does not find that the waiver rule stated in COMINT bars plaintiff's claims in this suit.

          3.     Laches

The last doctrine relied upon by L3 in its motion to dismiss is laches.  ECF No. 58-1 at 23-26; ECF No. 65 at 12-14.  According to L3, the doctrine of laches bars plaintiff's bid protest because iAccess delayed too long to file its bid protest.  L3 relies, to a great extent, on the discussion of laches in Global Dynamics, LLC v. United States, 137 Fed. Cl. 105, 114-17 (2018).[6]  ECF No. 58-1 at 23-25; ECF No. 65 at 12, 14.

The court finds that Global does not provide sufficient support for L3's defense of laches.  First, Global was an unusual case, with "unique circumstances."  137 Fed. Cl. at 117.  Second, the delay in filing the protest in Global was approximately one year, not a little more than three months.[7]  Id. at 116.  Finally, there was evidence that the delay in

---

[6]     To the extent that L3 also relies on COMINT, ECF No. 65 at 13, the court notes that the term laches does not appear in that Federal Circuit decision.

[7]     Although in some contexts three or four months may be an excessive time to wait before filing a protest, the court notes that the solicitation issued on September 1, 2017 and an award has not yet occurred.  The offerors were on notice, as of August 13, 2018,

Global was a strategic move by the plaintiff, i.e., inaction with an expectation that abstaining from protest would allow sufficient time for a procurement outcome favorable to the protestor to occur.  Id. at 116-17.  These facts in Global are not analogous to the facts of this case.

The court notes, too, that there is authority questioning whether the defense of laches should apply where statutes of limitation provide a measure of timeliness.  E.g., SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC, 137 S. Ct. 954 (2017); Petrella v. Metro-Goldwyn-Mayer, Inc., 572 U.S. 663 (2014); Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc., 988 F.2d 1157, 1161-64 (Fed. Cir. 1993); ATSC, 141 Fed. Cl. at 696 (citing SCA Hygiene, 137 S. Ct. at 960-61).  In light of these authorities and the differences between this case and the facts in Global, the court does not find that laches applies here.  Under the circumstances of this case, although it is a close question, iAccess's protest is not barred by the doctrine of laches.

For the above reasons, the court is unpersuaded by L3's arguments on standing, waiver, and laches.  Accordingly, L3's motion to dismiss is denied.

B.      Challenge to Technical Ratings

The court now turns to the merits of plaintiff's bid protest, beginning with plaintiff's challenge to the ratings it received for the Systems Engineering subfactor.  In the interest of brevity, the court restricts its focus here to the final evaluation results for iAccess stated in the second competitive range determination, or SCRD.  ECF No. 25-3 at 4-11.  iAccess's final proposal, after Round 1 and Round 2 discussions, received both an Unacceptable rating for the Systems Engineering subfactor, and a High Technical Risk rating, for this subfactor.  Id. at 4.  Pursuant to the evaluation scheme set forth in the solicitation, each of these ratings independently rendered iAccess's proposal ineligible for award.  ECF No. 23-2 at 89.  Because the agency did not believe iAccess's proposal had correction potential, iAccess was eliminated from the competition.  ECF No. 25-3 at 11.

1.      Evaluation Results for iAccess

a.      Technically Unacceptable

The Unacceptable rating was based on iAccess's approach to achieving [ ].  Id. at 5-6.  "[ ]."  Id. at 5.  The critical portion of iAccess's proposal discussed in this section of the SCRD was iAccess's "[ ]."  Id.

---

that a "more realistic" award date was contemplated for April 2019.  ECF No. 22-5 at 44. iAccess thus filed its protest before the expected contract award date and in the context of an ongoing procurement that at twenty-one months has yet to produce a contract award.

Overall, the agency found deficiencies in iAccess's [ ].  Id.  The Measure of Merit, or MoM, in question was [ ], which measured [ ].  Id.; see also ECF No. 23-1 at 47; ECF No. 23-2 at 93.  The problem areas in iAccess's [ ].[8]  ECF No. 25-3 at 5-6.  The agency's conclusion as to the significance of these flaws was that iAccess [ ].  Id. at 6.

### b.      High Technical Risk

Plaintiff's High Technical Risk rating for the Systems Engineering subfactor was based on three MoMs:  [ ].  ECF No. 25-3 at 6-11.  The court will not discuss every weakness or significant weakness described in the SCRD for MoMs [ ].  Instead, the court will focus on a single flaw related to each MoM to give context for the High Technical Risk rating iAccess received for the Systems Engineering subfactor.

MoM [ ] addresses "[ ]."  ECF No. 23-2 at 93.  One problem area noted by the agency was iAccess's "[ ]."  ECF No. 25-3 at 7.  According to the agency, "[ ]."  Id.  The SCRD stated that iAccess "[ ]."  Id.

As noted supra, MoM [ ] addresses the offeror's [ ].  ECF No. 23-2 at 93.  The flaws in iAccess's [ ].  ECF No. 25-3 at 10.  After discussions were concluded, the agency stated that iAccess's "proposed approach continued to pose a performance risk for MoM [ ]."  Id. at 9.

Finally, MoM [ ] requires an offeror to "[ ]."  ECF No. 23-2 at 93.  The [ ].  Id.  According to the agency, iAccess "[ ]."  ECF No. 25-3 at 10.  The concerns that the agency had expressed regarding iAccess's [ ].  Id. at 11.  The Air Force concluded that iAccess's [ ] "approach continues to constitute a weakness."  Id.

### 2.      Evaluation Errors Alleged by Plaintiff

### a.      Correction Potential

The court notes at the outset of its analysis that plaintiff's challenges to the technical ratings that iAccess received in the SCRD are interwoven with plaintiff's challenges to the discussions that preceded those ratings, or which did not extend into a third round of discussions.  For example, plaintiff argues that when the agency decided that iAccess's proposal lacked correction potential, that decision violated both the solicitation's evaluation procedures and the arbitrary and capricious standard of review applicable here.  ECF No. 55-1 at 40-41.  With regard to the issue of correction potential, however, plaintiff primarily focuses on the discussions that were either held, or not held, with iAccess.  Id. at 41.  Here, the court considers the technical ratings themselves, and whether these ratings survive the arbitrary and capricious standard of review.

---

[8]      According to L3, these section numbers originate in [ ].  ECF No. 58-1 at 29 n.8.

Plaintiff contends that the agency "failed to set forth a rational basis for concluding there was little correction potential" in the section of iAccess's proposal devoted to Systems Engineering. Id. The court disagrees. The agency's SCRD articulates a rational basis for the Air Force's position that correcting iAccess's proposal was not feasible under the circumstances of this procurement. ECF No. 25-3 at 4–11. Further, the position of the agency conforms with the evaluation scheme set forth in the solicitation. ECF No. 23-2 at 87.

Finally, in its reply brief, plaintiff contends that it was illogical for the agency to conclude that iAccess's final proposal could not easily be corrected, when an earlier version of iAccess's [ ] had been rated as acceptable. ECF No. 62 at 12. It appears to be undisputed that an earlier version of iAccess's [ ] was technically acceptable. ECF No. 59 at 23; ECF No. 65 at 17. Here, however, the court must defer to the agency's technical expertise. On this record, the agency could reasonably conclude that iAccess's final proposal had sufficient correction potential, just as it could reasonably conclude that iAccess's final proposal did not have sufficient correction potential. Under the arbitrary and capricious standard applicable here, the agency's assessment of the correction potential of iAccess's proposal is rational and unassailable.

b.      Second Competitive Range Determination Validity

In its reply brief, plaintiff suggests that the SCRD which eliminated iAccess's proposal from the competition for its technical flaws was an abuse of discretion under the analytical framework set forth in Harris Data Communications, Inc. v. United States, 2 Cl. Ct. 229, 241, aff'd, 723 F.2d 69 (Fed. Cir. 1983) (table). ECF No. 62 at 13–14. Although the term "abuse of discretion" is mentioned in plaintiff's opening brief, the brief contains no substantive analysis of the term. See generally ECF No. 55-1. The opposing briefs filed by the government and L3 also did not explore the term "abuse of discretion." See generally ECF No. 58-1; ECF No. 59. The court views plaintiff's abuse of discretion argument, as buttressed by the five-factor test set forth in Harris Data, as a new argument that is untimely raised in a reply brief and thus is waived. See, e.g., Arakaki v. United States, 62 Fed. Cl. 244, 246 n.9 (2004) ("The court will not consider arguments that were presented for the first time in a reply brief or after briefing was complete." (citing Novosteel SA v. United States, 284 F.3d 1261, 1274 (Fed. Cir. 2002); Cubic Def. Sys., Inc. v. United States, 45 Fed. Cl. 450, 467 (1999))).

Even if this argument were not waived, it is not persuasive. The five-factor test set forth in Harris Data, 2 Cl. Ct. at 241, is not founded on the regulation governing competitive range determinations in the current version of the FAR. See FAR 15.306(c)(2). Further, this court must apply the arbitrary and capricious standard of review to competitive range determinations, not the Harris Data factors. See, e.g., Orion, 704 F.3d at 1351 (reviewing the protestor's exclusion from the competition by applying the arbitrary and capricious standard). Finally, to the extent that the Harris Data factors are more stringent than the arbitrary and capricious standard, the Federal Circuit has

counseled against the use of more stringent tests in place of the arbitrary and capricious standard.  See Dell Fed. Sys., L.P. v. United States, 906 F.3d 982, 993 (Fed. Cir. 2018) (rejecting an "overly stringent test for corrective action," because the correct standard to be applied in bid protests is the arbitrary and capricious standard) (citation omitted).  For all of the above reasons, plaintiff's abuse of discretion argument founded on the Harris Data factors is unconvincing.

c.      Unacceptable Rating

The court turns now to the Unacceptable rating assigned to iAccess's Systems Engineering technical subfactor.  The parties hotly debate whether the flaws the agency perceived in sections [ ] of iAccess's [ ] justify a rating of Unacceptable.  One principal flaw in the [ ] was related to iAccess's marking of certain sections as [ ]; the other principal flaw concerned the [ ].

Plaintiff argues that iAccess appropriately used the designation [ ] in its [ ], and that its use of the [ ] designations did not merit the deficiency rating assigned in the SCRD.  ECF No. 55-1 at 24-25, 29; ECF No. 62 at 11-12.  L3 and the government disagree, and counter that criticism in the SCRD of iAccess's [ ] designations, or of the [ ], was proper.  ECF No. 58-1 at 29-31, 49 & n.16; ECF No. 59 at 23-24; ECF No. 65 at 17-18; ECF No. 66 at 6-9.  After due consideration of all of the parties' arguments and the record before the court, the court finds that the agency's deficiency rating regarding [ ] was rational.  ECF No. 25-3 at 5-6.

The term [ ], as that term is applied to an offeror's [ ], is referenced in Section L of the solicitation, as follows:

[ ]

ECF No. 23-2 at 71.  The same term is used again in Section M of the solicitation, which states, in relevant part:  "[ ]."  Id. at 93.  The SCRD states that iAccess's [ ].  ECF No. 25-3 at 5.  [ ].[9]  Id. at 6.

Plaintiff asserts that its final proposal contained [ ] for [ ] of iAccess's [ ], and that the record "provides no rationale for" the agency's determination that these [ ].  ECF No. 55-1 at 27.  There is a rationale stated in the SCRD, however.  According to the agency, in [ ] of iAccess's [ ]

[ ].

---

[9]      According to L3, [ ].  ECF No. 58-1 at 30 & n.9.  Because the rationale posited by L3 is not stated in the SCRD, the court does not rely on L3's assertion for its analysis here.

ECF No. 25-3 at 6.

Plaintiff has not explained why the Air Force's criticism of section [ ] in iAccess's [ ] is arbitrary or capricious.  On this record, the court finds that all of the deficiencies noted in the SCRD in support of iAccess's Unacceptable rating on the Systems Engineering technical subfactor are rational.  Plaintiff's challenge to its Unacceptable rating provides no reason to overturn the agency's decision to eliminate iAccess from this competition.

d.      High Technical Risk Rating

Plaintiff raises three principal challenges to the High Technical Risk rating assigned to iAccess's proposal, which were based on flaws in MoMs [ ].  ECF No. 55-1 at 31-40.  First and foremost is plaintiff's assertion that the High Technical Risk rating was arbitrary and capricious because the flaws noted in the SCRD had been entirely, or almost entirely, resolved through discussions.  Id. at 31-33, 35-38.  Second, plaintiff contends that positive technical ratings on other aspects of iAccess's proposal show that the flaws noted in the SCRD were inconsistent with the record and irrational.  Id. at 34-35, 39-40.  Third, plaintiff argues that there was, at most, only one unresolved EN remaining after discussions, and that a single weakness could not merit a High Technical Risk rating under the evaluation scheme in the solicitation.  Id. at 40.

The parties vigorously debate the meaning of the notation "resolved" that appears in the AR where agency evaluators documented the ENs that were issued in Round 1 and Round 2 discussions.  Plaintiff notes that some of this debate references information not in the AR.  ECF No. 62 at 31-32 (citing ECF No. 59 at 28).  The court need not expand the record of this case beyond the AR.  Plaintiff's position is that a "resolved" notation for an EN indicates that no weaknesses were found in iAccess's final proposal as to the topic of that EN.  See id. at 8 (stating that the "Contracting Officer erroneously relied upon ENs that had been 'resolved,' in which case the competitive range decision was arbitrary and capricious").

It is important to distinguish the parties' arguments in this regard from those that might be brought in a protest on significantly different facts.  A Source Selection Authority's rationale for award may be overturned if that decision relies on a number of weaknesses from an initial technical evaluation of proposals, when all of those weaknesses in the protestor's proposal were subsequently eliminated after discussions and final proposal revisions had been submitted by the offerors.  Indeed, that is the situation, broadly speaking, in the GAO decision cited by plaintiff, Celta Services, Inc., B-411835, B-411835.2, 2015 CPD ¶ 362, 2015 WL 7731719 (Comp. Gen. Nov. 2, 2015).  See ECF No. 55-1 at 31, 36; ECF No. 62 at 7-9 & n.3.  The record in that protest was "clear that the inclusion of Celta's weaknesses in the [Source Selection Authority's] memorandum was in error."  Celta, 2015 WL 7731719, at *7 & nn.8-9.

17

Here, however, the notation "resolved" is attached not to a specific weakness in an evaluation team's list of identified weaknesses, but to an EN. The record simply does not support plaintiff's contention that a "resolved" EN necessarily signifies that a weakness in the offeror's proposal has been eliminated. Indeed, the government cites one example from the AR where a weakness persisted even after an EN issued to another offeror had been marked "resolved." ECF No. 59 at 28 (citing ECF No. 25-4 at 201).

L3 argues that both a "resolved" EN notation and a weakness or significant weakness could co-exist in the evaluation record for iAccess's final proposal. ECF No. 58-1 at 41 (citing ECF No. 25-3 at 1619-20). L3 cites the Technical Evaluation Report as proof that a "resolved" EN did not eliminate proposal weaknesses and/or significant weaknesses. Id. at 41 (citing ECF No. 25-3 at 1454-62). The record citations provided by the government and L3 are sufficient to show that the "resolved" annotation for ENs does not carry the meaning that plaintiff proposes in this protest. Therefore, the court finds that the "resolved" ENs cited by plaintiff do not invalidate the High Technical Risk rating assigned to iAccess's proposal.

This finding also disposes of plaintiff's argument that its sole unresolved EN constituted just one weakness, and that one weakness cannot justify a High Technical Risk rating. Because "resolved" ENs did not necessarily eliminate weaknesses or significant weaknesses, the record does not show that iAccess, after discussions, had only one weakness. Because none of iAccess's weaknesses or significant weaknesses associated with MoMs [ ] have been shown to be irrational, the High Technical Risk rating, under the evaluation scheme set forth in the solicitation, has not been shown to be improper.

The court turns now to plaintiff's argument that its High Technical Risk rating was contradicted by other technical ratings that appear to address the same or similar aspects of iAccess's proposal. In essence, plaintiff relies on its ratings for MoM [ ], to contradict its weaknesses in MoM [ ], and its technical subfactor Schedule ratings to contradict its weaknesses in MoM [ ]. ECF No. 55-1 at 34-35, 39-40. The court cannot agree that the agency's ratings for MoM [ ] and MoM [ ] are invalid because they do not match ratings on different and distinct measures in the evaluation scheme.

Both the government and L3 argue that the MoMs must be individually satisfied, and that MoM [ ] is not the same as MoM [ ]. ECF No. 59 at 26-27; ECF No. 65 at 18 n.4; ECF No. 66 at 9. L3 contends, further, that each of the technical subfactors, Schedule and Systems Engineering, addresses distinct aspects of the offeror's approach. ECF No. 58-1 at 32. The government's and L3's arguments are more persuasive than plaintiff's attempt to convert MoM [ ] ratings into MoM [ ] ratings, or Schedule subfactor ratings into MoM [ ] ratings. In sum, all of plaintiff's challenges to the High Technical Risk rating it received for the Systems Engineering subfactor fail to meet its burden under the arbitrary and capricious standard applicable here.

C.      Challenge to Discussions

The parties are in apparent agreement that discussions held with offerors under FAR 15.306(d) must be meaningful and not misleading.  ECF No. 55-1 at 16-17, 30; ECF No. 58-1 at 46-49 & n.16; ECF No. 59 at 26.  There also appears to be no real dispute that an agency has considerable discretion in deciding whether to reopen or continue discussions.  See ECF No. 58-1 at 47-48 (citing cases); see also FAR 15.306(d)(3) ("The scope and extent of discussions are a matter of contracting officer judgment.").  The parties dispute, however, whether the Round 1 and Round 2 discussions held with iAccess were meaningful and not misleading, and whether further discussions should have been held with iAccess.  It is to these two topics that the court now turns.

1.      Round 1 and Round 2 Discussions

The court notes at the outset that for each of the flaws under the Systems Engineering subfactor noted in iAccess's proposal, the SCRD identified the ENs that had addressed the pertinent MoM in Round 1 and Round 2 discussions with iAccess.  ECF No. 25-3 at 5-7, 9-10.  The cited ENs in the SCRD that were delivered to iAccess are EN Nos. [ ].  Id.  Plaintiff also cites a number of ENs that were issued by the agency to iAccess, in support of its arguments regarding discussions, including EN Nos. [ ].  ECF No. 55-1 at 19, 21, 32-33, 37-38; ECF No. 62 at 7.

The court has reviewed the content of all of the ENs issued by the agency that are cited in plaintiff's briefs and compared these ENs to the proposal flaws noted in the SCRD.  See ECF No. 25-3 at 5-11, 1542-47, 1563-65, 1572-76, 1580-82, 1589-1612, 1615-20, 1624-33.  The court has also reviewed the relevant portions of the Technical Evaluation Report, which provides a comprehensive recitation of the Systems Engineering ENs issued to iAccess, the responses to those ENs received by the agency, and the agency's evaluation of iAccess's final proposal.  ECF No. 25-3 at 1129-1638.  Based on this record, the court concludes that the agency met the standard for meaningful discussions, because the ENs cited by plaintiff led iAccess into the areas of its proposal that, if changed, could have improved iAccess's chances for award.  See, e.g., Carahsoft Tech. Corp. v. United States, 86 Fed. Cl. 325, 342 (2009) ("Meaningful discussions are discussions that lead offerors into the areas of their proposals requiring amplification or correction.") (citations omitted).

The parties focus much of their attention on EN Nos. [ ] and [ ], and these ENs are representative of the ENs in the evaluation record of discussions.  ECF No. 55-1 at 35-36; ECF No. 58-1 at 39-41; ECF No. 59 at 16-18; ECF No. 62 at 10-11; ECF No. 65 at 15-17; ECF No. 66 at 3-4.  As discussed earlier in this opinion, the Air Force was concerned that iAccess's plan to [ ] was a weakness; this concern was reflected in negative risk ratings received by iAccess's final proposal in both the [ ] and [ ] MoMs.  See supra.  This concern was clearly communicated to iAccess in EN No. [ ], and iAccess's response to EN No. [ ] did not alleviate the agency's concern.  ECF No. 25-3 at

19

1615, 1617.  The agency therefore issued EN No. [ ], a "Follow-on EN" for the Round 2 discussions.  Id. at 1617.

EN No. [ ] reiterated the agency's concern with iAccess's [ ].  Id. at 1618.  This EN was marked as "resolved."  Id. at 1620.  The Technical Evaluation Report shows, however, that iAccess's response to EN No. [ ] did not remove the agency's doubt about the solution proposed by iAccess.  Id. at 1454-62.  The SCRD also contains a rational assessment of the remaining flaws in iAccess's [ ].  Id. at 7-9, 11.  Based on the record before the court, the SCRD and other documents in the record show that the agency conducted meaningful discussions with iAccess.

Plaintiff also characterizes the ENs as misleading.  Plaintiff contends, for example, that the agency, in EN No. [ ], did not specify whether it wanted specific artifacts or better justifications, for MoM [ ] where iAccess had marked sections of its [ ], and that this lack of clarity prevented iAccess from improving its proposal.  ECF No. 55-1 at 8, 26-27, 30.  The court finds, however, that EN No. [ ], ECF No. 25-2 at 808-09, was meaningful under the discretionary standard applicable here:  "While meaningful discussions should be as specific as practical considerations permit, they do not require the agency to identify each and every item that could be raised as to improve its proposal."  Carahsoft, 86 Fed. Cl. at 343 (internal quotations and citations omitted).  Nor has the court found any record evidence that EN No. [ ] was misleading.  See DMS All-Star Joint Venture v. United States, 90 Fed. Cl. 653, 670 (2010) ("[D]iscussions become misleading when communications from the government misdirect the protestor as it revises its proposal.") (citations omitted).  For all of the above reasons, the Round 1 and Round 2 discussions have not been shown to be improper.

2.    Round 3 Discussions Not Held

Plaintiff notes that the agency's technical evaluators produced additional follow-on ENs that were never issued, EN Nos. [ ] and [ ], and argues that additional discussions would have permitted iAccess to resolve weaknesses in the Systems Engineering subfactor.  ECF No. 55-1 at 31, 39, 41.  According to plaintiff, the agency's decision to not open Round 3 discussions with iAccess "was irrational, arbitrary, capricious, and an abuse of discretion."[10]  ECF No. 62 at 20.  There are two principles that support the agency's decision to not open a third round of discussions with iAccess.

---

[10]       In its reply brief, plaintiff argues for the first time that mere clarifications under FAR 15.306(a)(2), not Round 3 discussions, could have resolved the proposal weaknesses that led to iAccess being eliminated from the second competitive range.  ECF No. 62 at 18-19.  This argument is both untimely raised, in the court's view, and unpersuasive.  As L3 points out, the revisions required to remove the bases for iAccess's

First, the number of rounds of discussions to be held with offerors is largely a matter of the procuring agency's discretion.  See FAR 15.306(d)(3) (noting both that "the contracting officer must . . . indicate to, or discuss with, each offeror still being considered for award, deficiencies [and] significant weaknesses," but also that "[t]he scope and extent of discussions are a matter of contracting officer judgment"); see also FAR 15.306(d)(5) ("If, after discussions have begun, an offeror originally in the competitive range is no longer considered to be among the most highly rated offerors being considered for award, that offeror may be eliminated from the competitive range whether or not all material aspects of the proposal have been discussed, or whether or not the offeror has been afforded an opportunity to submit a proposal revision . . . .").  The parties cite numerous authorities, but no binding precedent on this court, for guidance on the topic of the contracting officer's discretion to cut off discussions, or to extend discussions, with a particular offeror.  ECF No. 58-1 at 46-49; ECF No. 59 at 24, 29; ECF No. 62 at 20; ECF No. 65 at 21-22.  Having considered all of the parties' arguments and the extensive record of this case, the agency's decision to not open a third round of discussions with iAccess was in accordance with the FAR and these authorities.  See, e.g., Lyon Shipyard, Inc. v. United States, 113 Fed. Cl. 347, 357 (2013) ("An agency need not reopen discussions simply because it perceives some weakness in an offeror's best and final proposal.") (citations omitted).

The second principle concerns the role of new weaknesses or deficiencies that appear in an offeror's revised proposal after discussions have begun.  This principle addresses the scenario where an offeror, when responding to other agency concerns, creates a new flaw in a proposal section that was previously adequate.  In this protest, iAccess altered section [ ] of its [ ] to its detriment in response to Round 2 discussions, by marking this [ ] and [ ].  ECF No. 52-6 at 219.

Deficiencies or weaknesses that appear for the first time in a revised proposal during discussions do not oblige the agency to extend discussions further with that offeror.  See Tele-Consultants, Inc. v. United States, No. 19-203C, 2019 WL 1615801, at *10 (Fed. Cl. Apr. 12, 2019) (rejecting the protestor's "contention that the Army was required to reopen discussions after [the protestor's] revised proposal introduced a new issue of noncompliance with the Solicitation's requirements"); Iron Bow Techs., LLC v. United States, 133 Fed. Cl. 764, 779 & n.11 (2017) (stating that the government is not obliged to reopen discussions with an offeror that makes unprompted negative changes to its revised proposal after discussions) (citations omitted).  The Air Force, therefore, was not obliged to reopen discussions with iAccess to allow iAccess an opportunity to further revise [ ].  For these reasons, plaintiff's challenge to the discussions held with iAccess,

---

Unacceptable and High Technical Risk ratings for Systems Engineering exceed the scope of mere clarifications under FAR 15.306(a)(2).  ECF No. 65 at 21-22.

contending that these discussions were not meaningful, were misleading, or were otherwise improper, must be rejected.

        D.    <u>De Facto</u> Responsibility Determination or Technical Evaluation

Plaintiff's final protest ground is that its elimination from the second competitive range, allegedly for technical flaws in its proposal, was, in effect, an improper <u>de facto</u> responsibility determination. ECF No. 45 at 11-12. The primary authorities cited for plaintiff's argument are <u>KWR Construction, Inc., v. United States</u>, 124 Fed. Cl. 345 (2015), <u>Competitive Range Solutions, LLC</u>, B-413104.10, 2017 CPD ¶ 124, 2017 WL 1511203 (Comp. Gen. Apr. 18, 2017), and <u>Joanell Laboratories, Inc.</u>, B-242415, B-242415.8, B-242415.9, B-242415.10, 92-1 CPD ¶ 369, 1992 WL 88096 (Comp. Gen. Apr. 15, 1992). ECF No. 55-1 at 43; ECF No. 62 at 21-23. Plaintiff also relies on FAR 9.104-1. ECF No. 62 at 23, 25.

In essence, plaintiff's argument contains three propositions. First, a small business may not be eliminated from a competition for responsibility reasons unless a Certificate of Competency has been sought from the Small Business Administration (SBA). ECF No. 55-1 at 42-43. Second, iAccess is alleged to have been eliminated by the Air Force from the second competitive range for responsibility reasons. <u>Id.</u> at 43; ECF No. 62 at 24-25. Third, plaintiff concludes that the agency's <u>de facto</u> responsibility determination was "irrational and impermissible." ECF No. 55-1 at 43.

Although the government and L3 do not disagree with plaintiff's first proposition, they argue that the elimination of iAccess from the second competitive range was not a <u>de facto</u> responsibility determination. As L3 states:

> The Air Force found iAccess's proposal Unacceptable and High Risk under a Technical Subfactor. The Air Force properly then excluded iAccess from the competitive range and did not make any responsibility determination for iAccess, <u>de facto</u> or otherwise. Accordingly, the Air Force decision falls squarely within the Air Force's purview, and the SBA has no role here.

ECF No. 58-1 at 51-52. In the court's view, this is an accurate representation of the facts established by the administrative record in this case.

The government compares the responsibility determination elements set forth in FAR 9.104-1 with the technical evaluation results for iAccess for the Systems Engineering subfactor. ECF No. 66 at 12. Defendant notes that "none of the language iAccess cites from the [SCRD] reflects a concern with iAccess's financial resources (FAR § 9.104-1(a)), its existing business commitments (FAR § 9.104-1(b)), its performance record (FAR § 9.104-1(c)-(d)) or its organizational, operational or capital resources (FAR § 9.104-1(e)-(f))." <u>Id.</u> (citing ECF No. 62 at 24-25). The court must

agree with L3 and the government that iAccess's elimination from the second competitive range was for "specific technical concerns with the proposed approach" for Systems Engineering.  Id.  Because the record does not support plaintiff's contention that a de facto responsibility determination occurred here, this protest ground, too, must be rejected.

      E.     Prejudice Inquiry Not Required, and Permanent Injunctive Relief Not Warranted

Because plaintiff has not met its burden to show significant error in the agency's decision to eliminate iAccess from the second competitive range in this procurement, an inquiry into the prejudicial nature of demonstrated procurement errors is not required. Further, because plaintiff has not succeeded on the merits of its protest, the court need not examine the factors required to support an award of injunctive relief.  See Dell Federal, 906 F.3d at 999 & n.13 (stating that "proving success on the merits is a necessary element for a permanent injunction").  This protest must be dismissed on the merits.

IV.    Conclusion

Accordingly,

(1)    Plaintiff's motion for judgment on the AR, ECF No. 55, is **DENIED**;

(2)    Intervenor-defendant's motion to dismiss or, in the alternative, cross-motion for judgment on the AR, ECF No. 58, is **DENIED in part**, as to the motion to dismiss, and **GRANTED in part**, as to the cross-motion for judgment on the AR;

(3)    Defendant's cross-motion for judgment on the AR, ECF No. 59, is **GRANTED**;

(4)    The clerk's office is directed to **ENTER** final judgment for defendant and intervenor-defendant, **DISMISSING** plaintiff's complaint, with prejudice; and,

(5)    On or before **June 21, 2019**, the parties shall **CONFER** and **FILE** a **proposed redacted version** of this opinion, with any competition-sensitive or otherwise protectable information blacked out.

IT IS SO ORDERED.

                        s/Patricia E. Campbell-Smith
                        PATRICIA E. CAMPBELL-SMITH
                        Judge